ANTHONY GIULIANO, Plaintiff, *v.* EDITH BIRD GIULIANO, Defendant. JOSEPH MESZAROS, Plaintiff, *v.* EDITH GIULIANO MESZAROS, Defendant.

Supreme Court Special Term. Bronx County, April 14, 1937.

*Maxwell Gross*, for the plaintiffs.

*Louis Scheuer*, for the defendant.

McLAUGHLIN (CHARLES B.), J. These are two actions tried together against the same defendant. Defendant's first husband Giuliano, sues for divorce and her second husband, Meszaros, sues for an annulment. The determination of both actions depends in the first instance upon the validity of a decree of divorce obtained by the defendant against the first husband in the State of West Virginia. If that decree is valid both actions must fall and no other question need be considered.

Defendant and Giuliano, residents of West Virginia, were married there in 1920. In 1926 he came to New York and shortly thereafter the defendant and their two children joined him. They continued to reside in New York until 1929, when he abandoned her. It appears that after she joined her husband in New York, defendant from time to time had been returning to her parent's home in West Virginia due to lack of proper support from the plaintiff Giuliano. After her husband abandoned her, defendant returned to West Virginia and was there in 1931 and 1932. Her testimony on this point was contradicted by the plaintiff Meszaros and the witnesses called by him, who claimed that they either saw or visited her in New York at different addresses during this period. Their testimony, however, was not convincing and was vague and unreliable as to dates. There was, undoubtedly, a long period during which she was away from New York, which was the time in 1931 and 1932 when defendant testified she was in West Virginia. In August, 1932, she instituted a divorce proceeding against Giuliano in West Virginia and a divorce was granted

but the decree was not entered until August, 1935, at which time it was entered *nunc pro tunc* as of August, 1932. In September, 1934, the defendant married the plaintiff Meszaros in New York. The West Virginia divorce was obtained pursuant to the laws of that State upon the ground of desertion, but no personal service was made upon Giuliano.

The question then arises, " Will the courts of this State recognize the West Virginia divorce as binding under these circumstances?" Here is a situation where a man marries a woman in West Virginia, brings her to New York and then abandons her here. Has she the right then to return to the original marital domicile and obtain a divorce against him under the laws of that State?

When the defendant followed her husband to New York and set up a home with him, even though squalid, the matrimonial domicile was moved to this State. When he abandoned her in New York, and she returned to West Virginia, did the matrimonial domicile go with her so as to give the West Virginia court jurisdiction? There is strong authority for the proposition that where one spouse puts it into the power of the other spouse rightfully to live apart and, therefore, to acquire a separate domicile, he thereby subjects his interest in the marriage status to the law of that domicile. The reasoning in the decision of *Haddock* v. *Haddock* (201 U. S. 562) would indicate that the court of the domicile of the innocent party has jurisdiction to render a decree binding everywhere. The facts of the instant case, of course, differ from those of the *Haddock* case, for here the innocent party did not remain in New York, the existing matrimonial domicile, but returned to West Virginia, the former and original matrimonial domicile. The pertinent part of the *Haddock* v. *Haddock* opinion which seems to apply to this case is found at page 571, where the court said: " Hence, the place where the wife was domiciled when so abandoned constitutes her legal domicil until a new actual domicil be by her elsewhere acquired." (Citing *Barber* v. *Barber*, 21 How. 582.) A fair interpretation of the *Haddock* v. *Haddock* case would seem to justify the conclusion that the abandoned party retains the matrimonial domicile and may take it with him or her. (*Montmorency* v. *Montmorency*, [Tex. Civ. App. 1911] 139 S. W. 1168, 1172; *Wagoner* v. *Wagoner*, [Tex. Civ. App.] 229 id. 1064, 1070; 39 Harv. Law Rev. 417, 426; *Richards* v. *Richards*, 132 Misc. 551; affd., 225 App. Div. 726. See, also, *Wacker* v. *Wacker*, 154 id. 495, 497; *Hunt* v. *Hunt*, 72 N. Y. 217.)

An almost parallel case is that of *Dean* v. *Dean* (241 N. Y. 240, 244). The parties were married in Ontario, Canada, and lived

there. The husband went to Pennsylvania and obtained a divorce. The wife then came to New York and instituted divorce proceedings. It was held that the Pennsylvania decree was void and that the wife could sue in this State. The court said (at p. 244): " The wife having been deserted by her husband, might maintain a domicile of her own (*Williamson* v. *Osenton*, 232 U. S. 619; *Perkins* v. *Perkins*, 225 Mass. 82), and she chose to maintain one in Ontario till later she changed it to New York." Under the authority of that case and the case of *Haddock* v. *Haddock* (*supra*) it would appear that the defendant in the instant case had the right, upon being abandoned, to return to West Virginia and there obtain a valid decree.

In giving recognition to the West Virginia decree there will be no conflict with the public policy of this State (*Hubbard* v. *Hubbard*, 228 N. Y. 81), where the court said (p. 84): " While the decree divorcing the defendant from her former husband may adjudge her marital status within the State of Massachusetts, as to the husband and world at large, the courts of the State of New York, untrammeled by the constitutional clause, may give it within the confines of their jurisdiction the efficacy and effect they may deem rightful and salutary in view of the public policy of the State. Generally speaking, each State when unrestrained by the Federal Constitution, has the right to adjudge and declare the marital status of those residing and domiciled within it." And (at p. 85): " Whether or not the operation of a foreign decree of divorce in a given case will contravene the policy or wrong or injure citizens of the State is exclusively for its courts to determine. They are the final judges of the occasions on which the exercise of comity will or will not make for justice or morality. The exercise rests in sound judicial discretion guided and controlled by the policy of the State, relevant judicial decisions and the circumstances of the case. (*Edgerly* v. *Bush*, 81 N. Y. 199; *Marshall* v. *Sherman*, 148 id. 9; *Matter of Waite*, 99 id. 433; *International Harvester Company* v. *McAdam*, 142 Wis. 114.) "

Since we hold the West Virginia decree to be binding upon the plaintiff Giuliano, his present action for divorce must fail. it also follows that the defendant was free to marry plaintiff Meszaros in 1934, and his action for an annulment must also fail. It is argued that since the divorce decree had not been entered in 1934, at the time of defendant's marriage to plaintiff Meszaros, that marriage was a nullity, and that defendant was, therefore, guilty of adultery. At the trial the copy of the decree that was offered was not properly authenticated and defendant was given permission to subsequently obtain a proper copy. The decree

properly authenticated is now before the court. It is received and an exception to its admission is granted the plaintiffs. It was entered in West Virginia in 1935, *nunc pro tunc* as of August, 1932, which was an adjudication of that court that the divorce should date as of 1932. We may not question the procedure of the West Virginia court. (*Dunstan* v. *Higgins*, 138 N. Y. 70, 75; *Hilton* v. *Guyot*, 159 U. S. 113.) Its decree is binding as of the date it fixed. The cases of *Hindermann* v. *Hindermann* (245 App. Div. 246) and *Merrick* v. *Merrick* (266 N. Y. 120) are not in point. The question in the first case was whether New York would recognize a *nunc pro tunc* decree of the court of a foreign State which never acquired jurisdiction. The *Merrick* case held that an order could not be made *nunc pro tunc* recording a fact as of a prior date when that fact did not then exist. In the present case the court in West Virginia had full jurisdiction and it would appear that its granting of a decree *nunc pro tunc* may be questioned only by the courts of that State as the *nunc pro tunc* decree did not give any rights that did not exist at the original date when jurisdiction was acquired.

Judgment is granted in both cases dismissing the complaint on the merits. Settle findings of fact and conclusions of law in each case separately.